Case No. 17-50386

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MICHAEL MIRANDO,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of California
Case No. 2:16-CR-00215-PA
The Honorable Percy Anderson, United States District Judge

## APPELLANT'S OPENING BRIEF

James W. Spertus (CA SBN 159825)
jim@spertuslaw.com
John Hanusz (CA SBN 277367)
john@spertuslaw.com
SPERTUS, LANDES & UMHOFER, LLP
1990 South Bundy Drive, Suite 705
Los Angeles, California 90025
Telephone: (310) 826-4700
Facsimile: (310) 826-4711

Attorneys for Defendant-Appellant
Michael Mirando

April 4, 2018

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ..........................................................1

BAIL STATUS .................................................................................1

STATEMENT OF ISSUES ..................................................................1

STATEMENT OF THE CASE................................................................2

I.    The Charged Offenses.................................................................2

II.   Trial Evidence .........................................................................3

III.  Sentencing ..............................................................................6

SUMMARY OF THE ARGUMENT ......................................................7

ARGUMENT ..................................................................................9

I.    Sentencing Errors....................................................................9

    A.    Standard of Review ........................................................9

    B.    The District Court Erred in Calculating Loss Amount, Because the Unrebutted Evidence at Sentencing Established that Mr. Mirando Did Not Intend to Cause Loss .................9

        1.    The Government's Loss Calculations and the Presentence Report....................................................10

        2.    The Sentencing Hearing.........................................12

        3.    Mr. Mirando Had No Intent to Cause the Intended Loss Found by the District Court.............................14

    C.    The District Court Erred in Applying the Wrong Standard of Proof...............................................................17

    D.    The Court's Determination of Loss, the Number of Victims, and Restitution Was Not Supported by Reliable Evidence................20

    E.    The District Court Erroneously Applied the Sophisticated-Means Enhancement..........................................................25

    F.    The District Court Improperly Penalized Mr. Mirando For Exercising His Right to Trial by Jury.........................................29

II.   Trial Errors..............................................................................34

i

A.     The District Court Improperly Limited Cross-Examination of Chief Prosecution Witness Stanton Crowley ................................... 34

     1.     Standard of Review ................................................................ 34

     2.     The District Court's Rulings Significantly Hampered Mr. Mirando's Defense ......................................................... 34

B.     The District Court Improperly Instructed the Jury Regarding Intent ....................................................................... 38

     1.     Standard of Review ................................................................ 38

     2.     The District Court's Instructions Regarding Intent Were Flawed and Misleading ................................................. 39

CONCLUSION ........................................................................................... 42

CERTIFICATE OF RELATED CASES ................................................... 43

CERTIFICATE OF COMPLIANCE ......................................................... 44

CERTIFICATE OF SERVICE .................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

Bordenkircher v. Hayes,
434 U.S. 357 (1978).......................................................................32

Cleveland v. United States,
531 U.S. 12 (2000)................................................................. 40, 41

Davis v. Alaska,
415 U.S. 308 (1974).............................................................. 36, 37

Delaware v. Van Arsdall,
475 U.S 673 (1986)......................................................................37

Fowler v. Sacramento County Sheriff's Department,
421 F.3d 1027 (9th Cir. 2005) ...................................................36

Gall v. United States,
552 U.S. 38 (2007)........................................................................9

McNally v. United States,
483 U.S. 350 (1987)............................................................... 40, 41

United States v. Adamson,
291 F.3d 606 (9th Cir. 2002) .....................................................36

United States v. Adepoju,
756 F.3d 250 (4th Cir. 2014) .....................................................27

United States v. August,
86 F.3d 151 (9th Cir. 1996) .......................................................24

United States v. Blitz,
151 F.3d 1002 (9th Cir. 1998) ...................................................10

United States v. Carty,
520 F.3d 984 (9th Cir. 2008) .......................................................9

United States v. Cherer,
    513 F.3d 1150 (9th Cir. 2008) ...................................................................39

United States v. Cochran,
    109 F.3d 660 (10th Cir. 1997) .................................................................41

United States v. Cruz,
    977 F.2d 732 (2d Cir. 1992)......................................................................33

United States v. Fallah,
    No. H-07-55, 2008 WL 5102281 (S.D. Tex. Dec. 1, 2008) .................15

United States v. Fitch,
    659 F.3d 788 (9th Cir. 2011) ........................................................... 18, 19

United States v. Garcia-Sanchez,
    189 F.3d 1143 (9th Cir. 1999) .................................................................24

United States v. Gonzalez-Aparicio,
    663 F.3d 419 (9th Cir. 2011) ...................................................................38

United States v. Hance,
    501 F.3d 900 (8th Cir. 2007) ...................................................................27

United States v. Harris,
    635 F.2d 526 (6th Cir. 1980) ...................................................................32

United States v. Hart,
    324 F.3d 575 (8th Cir. 2003) ........................................................... 27, 29

United States v. Horob,
    735 F.3d 866 (9th Cir. 2013) ........................................................... 27, 28

United States v. Hymas,
    780 F.3d 1285 (9th Cir. 2015) ......................................................... 18, 19

United States v. Isiwele,
    635 F.3d 196 (5th Cir. 2011) ...................................................................14

United States v. Jain,
    93 F.3d 436 (8th Cir. 1996) .....................................................................41

United States v. Jordan,
    256 F.3d 922 (9th Cir. 2001) ............................................................... 18

United States v. Joseph,
    716 F.3d 1273 (9th Cir. 2013) ............................................................. 38

United States v. Kleinman,
    880 F.3d 1020 (9th Cir. 2018) ............................................................. 32

United States v. Kohring,
    637 F.3d 895 (9th Cir. 2011) ............................................................... 37

United States v. Larson,
    495 F.3d 1094 (9th Cir. 2007) ............................................................. 34

United States v. Lemus,
    847 F.3d 1016 (9th Cir. 2016) ............................................................. 24

United States v. Lessard,
    17 F.3d 303 (9th Cir. 1994) ................................................................. 40

United States v. Livingston,
    725 F.3d 1141 (9th Cir. 2013) ............................................................. 39

United States v. Manatau,
    647 F.3d 1048 (10th Cir. 2011) .................................................... 10, 15

United States v. Medina-Cervantes,
    690 F.2d 715 (9th Cir. 1982) ........................................................ 32, 33

United States v. Mendoza,
    11 F.3d 126 (9th Cir. 1993) ................................................................. 40

United States v. Mezas de Jesus,
    217 F.3d 638 (9th Cir. 2000) ............................................................... 18

United States v. Miller,
    316 F.3d 495 (4th Cir. 2003) ............................................................... 15

United States v. Montano,
    250 F.3d 709 (9th Cir. 2001) ............................................................... 28

v

United States v. Nachamie,
　　121 F. Supp. 2d 285 (S.D.N.Y. 2000) ........................................... 15, 16

United States v. Paul,
　　37 F.3d 496 (9th Cir. 1994) ...................................................................40

United States v. Popov,
　　742 F.3d 911 (9th Cir. 2014) ................................................. 14, 15, 16

United States v. Rodriguez,
　　880 F.3d 1151 (9th Cir. 2018) ..............................................................38

United States v. Romo-Romo,
　　246 F.3d 1272 (9th Cir. 2001) ..............................................................38

United States v. Schoneberg,
　　396 F.3d 1036 (9th Cir. 2005) ..............................................................34

United States v. Singh,
　　390 F.3d 168 (2d Cir. 2004)...................................................................15

United States v. Smith,
　　561 F.3d 934 (9th Cir. 2009) ................................................................40

United States v. Starr,
　　816 F.2d 94 (2d Cir. 1987)....................................................................41

United States v. Staten,
　　466 F.3d 708 (9th Cir. 2006) ......................................................... 18, 19

United States v. Terry,
　　911 F.2d 272 (9th Cir. 1990) ................................................................40

United States v. Thomsen,
　　830 F.3d 1049 (9th Cir. 2016) ..............................................................28

United States v. Tit Yat Chin,
　　372 F.3d 31 (2d Cir. 2004)....................................................................29

United States v. Treadwell,
　　593 F.3d 990 (9th Cir. 2010) ......................................................... 18, 19

vi

United States v. Uramoto,
  638 F.3d 84 (9th Cir. 1980) ..................................................................36

United States v. Waknine,
  643 F.3d 546 (9th Cir. 2008) ..............................................................24

**Federal Statutes**

18 U.S.C. §924 ........................................................................................40

18 U.S.C. §3231 ........................................................................................1

18 U.S.C. §1341 ................................................................................ 40, 41

18 U.S.C. §1343 ......................................................................................40

18 U.S.C. §1344 ......................................................................................40

18 U.S.C. §1347 ........................................................................................1

28 U.S.C. §1291 ........................................................................................1

**United States Sentencing Guidelines**

U.S.S.G. §2B1.1 ......................................................................... 6, 25, 26, 27

U.S.S.G. §3C1.1 ........................................................................................6

## JURISDICTIONAL STATEMENT

On October 30, 2017, the Honorable Percy Anderson, United States District Judge, sentenced Michael Mirando to a 97-month custodial sentence following his conviction at trial on fifteen health care fraud counts. See 18 U.S.C. §§1347, 2(b). (ER 1; CR 102.)[1]  The district court ordered Mr. Mirando to pay restitution in the amount of $3,025,329.47. (ER 2; CR 102.)

The judgment was entered on October 31, 2017. (ER 1; CR 102.)  Mr. Mirando timely filed a notice of appeal on November 7, 2017. (ER 63; CR 103.)

The district court had jurisdiction pursuant to 18 U.S.C. §3231.  This Court has jurisdiction pursuant to 28 U.S.C. §1291.

## BAIL STATUS

Appellant is in federal custody serving his sentence, and his projected release date is November 6, 2024.

## STATEMENT OF ISSUES

1.      Whether the district court erred by failing to limit the amount of intended loss for sentencing purposes to the customary insurance reimbursement rates that Mr. Mirando expected to receive.

---

[1]  "ER" refers to the Excerpts of Record, which have been filed concurrently with this brief.  "PSR" refers to the Sealed Presentence Report, which has also been filed concurrently with this brief.  "CR" refers to the Clerk's Record and is followed by the applicable docket control number.

1

2.      Whether the district court erred by applying the wrong standard of proof when imposing sentencing enhancements.

3.      Whether the district court erred when it based Mr. Mirando's sentence on unreliable and speculative evidence regarding loss, restitution, and the number of victims.

4.      Whether the district court erred by imposing an enhancement for sophisticated means when the charged scheme did not involve sophisticated means.

5.      Whether the district court erred by punishing Mr. Mirando for exercising his constitutional right to a jury trial.

6.      Whether the district court erred by limiting the cross-examination of the government's chief witness regarding prior bad acts and the witness's bias.

7.      Whether the district court erred by incorrectly instructing the jury on the law regarding intent.

## STATEMENT OF THE CASE

**I.      The Charged Offenses**

The Indictment alleges that, beginning in 2005, Mr. Mirando was a "member and owner" of Holter Labs, LLC ("Holter Labs"), a corporation that provided cardiac monitors (known as Holter monitors) to physicians throughout the country. (ER 1542, 1546; CR 1 at 1, 5.)  Worn by individuals, Holter monitors measured physiological information that was then digitally stored and transmitted to Holter

Labs.  (ER 1546; CR 1 at 5.)  Holter Labs downloaded the data and created reports for requesting physicians.  (ER 1546; CR 1 at 5.)

The Indictment alleges that Mr. Mirando would bill insurance companies for services that the Holter monitors "could not and did not perform."  (ER 1546; CR 1 at 5.)  It also alleges that Mr. Mirando submitted invoices to insurance companies for services that the monitors "could perform, but did not perform."  (ER 1547; CR 1 at 6.)  The Indictment alleges that Mr. Mirando submitted, or caused to be submitted, "approximately $6,000,666.25 in fraudulent claims, resulting in payment of approximately $2,331,274.81" by various insurance companies.  (ER 1547; CR 1 at 6.)  The Indictment further alleges fifteen individual acts of fraud involving three insurance companies and four patients.  (ER 1548-1549; CR 1 at 7-8.)  The total "amount falsely claimed," as alleged in the Indictment, was $10,245. (ER 1548-1549; CR 1 at 7-8.)  Although Stanton Crowley, Mr. Mirando's partner and co-owner of Holter Labs, was referenced in the Indictment by his initials (ER 1543, 1546; CR 1 at 2, 5), Mr. Mirando was the only individual charged.

## II.    Trial Evidence

At trial, the government presented testimony from four physicians who ordered Holter monitors for four individual patients.  (ER 762-781; 4/27/2017 RT 9-28; ER 795-814; 4/27/2017 RT 42-61; ER 880-899; 4/27/2017 RT 127-146; ER 913-928; 4/27/2017 RT 160-75.)  All of the physicians testified that they ordered

3

the individual patients to wear the monitors for 24-hour periods. (ER 765; 4/27/2017 RT 12; ER 798-799; 4/27/2017 RT 45-46; ER 882-883; 4/27/2017 RT 129-30; ER 914; 4/27/2017 RT 161.) One of the physicians testified that Holter monitors can be worn for up to thirty days. (ER 883; 4/27/2017 RT 130.) The government presented the testimony of four individual patients, all of whom testified that they wore the Holter monitors for one or two days. (ER 1122; 4/26/2017 RT 134; ER 784-785; 4/27/2017 RT 31-32; ER 871-872; 4/27/2017 RT 118-119; ER 906; 4/27/2017 RT 153.) None of the doctors or patients testified about ever having any direct contact with Mr. Mirando.

The government also presented the testimony of three insurance company representatives who described the claims and reimbursement process, most of which was automated. (ER 816-869; 4/27/2017 RT 63-116; ER 929-951; 4/27/2017 RT 176-198; ER 952-964; 4/27/2017 RT 199-211.) None of the insurance company representatives testified that Holter Labs' billings were flagged internally as being fraudulent. With regard to specific claims, the carrier representatives limited their testimony to the billings referenced in the fifteen charged counts. None of the representatives testified about having had any direct contact with Mr. Mirando.

Stanton Crowley, the co-founder and co-owner of Holter Labs, was the government's chief witness against Mr. Mirando. Although Mr. Crowley had

previous experience with Holter monitors and medical billing (unlike Mr. Mirando), Mr. Crowley testified that Mr. Mirando was in charge of the company's billing. (ER 969; 4/27/2017 RT 216.) Mr. Crowley then placed responsibility for the scheme at Mr. Mirando's feet, and Mr. Crowley was the only witness who provided any insight into operations at Holter Labs. Trial counsel attempted to cross-examine Mr. Crowley regarding Mr. Crowley's own criminal liability and motivation for testifying, but was prevented from doing so by the district court. (ER 675-683; 4/28/2017 RT 115-123.)

Federal Bureau of Investigation Special Agent Kathleen Kennedy testified about the scope of the alleged scheme, which she estimated involved $10.3 million in fraudulent billing by Holter Labs, with corresponding payments totaling $3.5 million. (ER 716; 4/28/2017 RT 156.) Ms. Kennedy testified that the government's loss estimate was based in part on Google searches and reviewing insurance company web sites. (ER 692; 4/28/2017 RT 132.) Mr. Mirando did not testify at trial.

Among other instructions, the district court gave the Ninth Circuit model jury instruction on mail fraud (9th Cir. Crim. Jury Inst. 8.121), which was modified to address health care fraud. (ER 502, 510; 5/2/2017 RT 38, 46). In addition, the district court included a special instruction not found in the pattern instructions:

"Loss is not an element of health care fraud, nor is an intent to cause loss." (ER 504, 510; 5/2/2017 RT 40, 46.)

## III. Sentencing

On May 2, 2017, the jury returned guilty verdicts on all counts. (ER 523-525; 5/2/2017 RT 59-61.) The probation officer filed the Presentence Report ("PSR") on September 25, 2017. (PSR 1562; CR 91.) Mr. Mirando filed his sentencing position containing his objections to the PSR on October 16, 2017. (ER 177; CR 93.) The government filed its sentencing memorandum that same day. (ER 121; CR 94.) An addendum to the PSR was then submitted on October 23, 2017. (PSR 1584; CR 95.) The government filed a response to Mr. Mirando's sentencing memorandum on October 23, 2017. (ER 85; CR 97.) Mr. Mirando filed a response to the government's supplemental filing on October 25, 2017. (ER 72; CR 98.)

The probation officer used the 2016 Guidelines Manual to compute the applicable offense level. (PSR 1569; CR 91 at 8.) The base offense level was level six. (PSR 1570; CR 91 at 9.) With respect to loss, the probation officer recommended an eighteen-level increase pursuant to U.S.S.G. §2B1.1(b)(1). (PSR 1570; CR 91 at 9.) Three two-level increases were also recommended for: (1) the number of victims (U.S.S.G. §2B1.1(b)(2)(A)(i)); (2) use of sophisticated means (U.S.S.G. §2B1.1(b)(10)(C)); and (3) obstruction of justice (U.S.S.G. §3C1.1).

6

(PSR 1570-1571; CR 91 at 9-10.) The recommended total offense level was level thirty. (PSR 1572; CR 91 at 11.)

The district court determined that the total amount of fraudulent billings submitted to insurance companies was $8.4 million, and used this amount as intended loss. (ER 25; 10/30/2017 RT 17.) Mr. Mirando testified at sentencing, and then argued through counsel that that the intended loss was between 25 and 30 percent of the total billings, given Mr. Mirando's knowledge of the prevailing insurance reimbursement rates. (ER 29-34; 10/30/2017 RT 21-26.) The district court calculated the actual loss, for which restitution was owed, to be $3,025,329.47. (ER 58; 10/30/2017 RT 50.)

The district court also applied the recommended enhancements for sophisticated means, the number of victims, and obstruction of justice. (ER 36-39; 10/30/2017 RT 28-31.) The final adjusted offense level found by the district court was level thirty, and the corresponding advisory Guidelines range was 97-121 months. (ER 47; 10/30/2017 RT 39.) The government recommended a 121-month sentence, and the district court sentenced Mr. Mirando to 97 months in prison.

## SUMMARY OF THE ARGUMENT

The district court committed multiple reversible errors at Mr. Mirando's sentencing. The district court improperly calculated the loss amount at $8.4 million by failing to account for well-documented lower reimbursement rates when

determining intended loss. The district court also failed to give any weight to Mr. Mirando's unrebutted testimony regarding intended loss, and it discounted the testimony even before Mr. Mirando was sworn as a witness and testified. The district court's findings regarding the loss and victim enhancements, as well as restitution, were not supported by reliable evidence. Moreover, given that the sentencing enhancements increased Mr. Mirando's sentence five-fold, the district court erred by not applying the higher standard of proof that due process requires, which is the clear-and-convincing evidence standard. The district court imposed the sophisticated-means enhancement even though there was no evidence that the scheme involved the use of sophisticated means. At its core, the 97-month sentence imposed by the district court was designed to punish Mr. Mirando for exercising his right to trial. The district court gave no consideration to any arguments it deemed inconsistent with the arguments made by defense counsel at trial, even though Mr. Mirando did not testify at trial.

In addition to the sentencing errors described above, the district court also erred at trial by denying Mr. Mirando's right to cross-examine the government's chief witness, and by improperly instructing the jury regarding intent. For these additional reasons, this case should be remanded to the district court for a new trial.

## ARGUMENT

### I.     Sentencing Errors

#### A.     Standard of Review

A criminal sentence is reviewed for reasonableness, and must be set aside if it is procedurally erroneous or substantively unreasonable.  Gall v. United States, 552 U.S. 38, 46 (2007); United States v. Carty, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).  District courts must begin all sentencing proceedings by calculating the applicable Guidelines range.  Carty, 520 F.3d at 991.  The failure to correctly calculate the applicable Guidelines range constitutes procedural error, rendering the sentence unreasonable as a matter of law.  Id. at 993.

#### B.     The District Court Erred in Calculating Loss Amount Because the Unrebutted Evidence at Sentencing Established that Mr. Mirando Did Not Intend to Cause Loss

The district court determined for sentencing purposes that the intended loss was approximately $8.4 million, which corresponded to an upward Guidelines adjustment of eighteen levels, from a base offense level of six.  (ER 36; 10/30/2017 RT 28; see also PSR 1570; CR 91 at 9.)  This intended loss figure was based on the total amount of allegedly fraudulent claims that Holter Labs submitted to various insurance companies.[2]  The defense objected to the $8.4

---

[2]  The total restitution amount—the amount insurance companies *actually paid* for the allegedly fraudulent claims—was just over $3 million, significantly less than the intended loss calculated by the district court.  (ER 58; 10/30/2017 RT 50.)

million calculation, arguing that Mr. Mirando never intended to be reimbursed in full for the amounts submitted to the insurance companies. Mr. Mirando was aware of the industry custom to reimburse at the rate of 25 to 30 percent of claims made. Indeed, Mr. Mirando testified under oath to this fact at sentencing, and his testimony remains unrebutted today.

While the Guidelines have long required that loss be measured by the greater of actual or intended loss, even the intended loss must nonetheless be based on the facts of the case. See United States v. Blitz, 151 F.3d 1002, 1009-10 (9th Cir. 1998). An intended loss means a loss that the defendant purposely intended to inflict. United States v. Manatau, 647 F.3d 1048, 1050 (10th Cir. 2011). A defendant cannot purposely intend to inflict a loss that he knows cannot result. As discussed below, the unrebutted evidence in this case indicates that the intended loss was, at most, a fraction of the amount calculated by the district court, and the district court clearly failed to correctly calculate the applicable Guidelines range with respect to loss.

### 1. The Government's Loss Calculations and the Presentence Report

The evidence presented to the jury regarding alleged loss was a tiny fraction of the ultimate loss claimed by the government at sentencing. The jury never found that Mr. Mirando's actions resulted in an $8.4 million loss, and the loss in

the charged counts was $10,245, which is approximately .001 percent of the total later claimed by the government to be intended loss. (ER 1548; CR 1 at 7-8.)

Prior to sentencing, the government submitted its estimate of total intended loss to the probation officer. The probation officer then calculated the intended loss to be "approximately $8.4 million," based on duplicate dates of service or on tests that the monitors were unable to perform. (PSR 1570; CR 91 at 9.)[3] The Presentence Report made no reference to reimbursement rates, nor did it contain any analysis of the government's asserted loss figure. Defense counsel objected, arguing that the intended loss calculation was not supported by reliable evidence, and that the calculation and did not reflect established reimbursement rates. (ER 182-184; CR 93 at 6-8.) In response, the probation officer referenced a spreadsheet provided by the government to support its loss calculations, but provided no analysis regarding the loss calculations, essentially deferring to the government on that issue. Without elaboration or explanation, the probation officer indicated that it did not find the expert report submitted by defense counsel (ER 202; CR 93-1) to be persuasive. (PSR 1585; CR 95 at 2.) Defense counsel responded that Mr. Mirando would testify at sentencing regarding his understanding of insurance industry reimbursement practices. Mr. Mirando

---

[3] The $8.4 million figure is even significantly higher than the $6,000,666.25 intended loss alleged in the Indictment. (ER 1547; CR 1 at 6.)

11

believed that the insurance companies would pay only "a small amount, if any amount, as a matter of course and that the rejection of, or the reduction of payment, was unrelated to any accusation of fraud." (ER 82; CR 98 at 11.) Service providers submit bills at usual and customary rates, and carriers pay at lower contractual rates.

### 2. The Sentencing Hearing

At the outset of Mr. Mirando's sentencing hearing, defense counsel informed the district court that Mr. Mirando would testify. The district court interrupted counsel, making clear that the court would not credit any testimony from Mr. Mirando:

| | |
|---|---|
| Counsel: | Mr. Mirando, as I indicated in my declaration, is prepared to inform the Court that he understood that these insurance companies would pay maybe 30 percent of the claims. Mr. Arrego has attached, in his report— |
| The Court: | Really? |
| Counsel: | Yes, sir. |
| The Court: | That's his claim now? Because I thought his defense was hey, I didn't know anything about this business decision from day one. There were these other fraudsters who really were the guys who taught me how to do this. Now he's claiming he's an expert in the insurance industry? |

(ER 14-15; 10/30/2017 RT 6-7.) As the proceeding continued, the district court found that the prima facie intended loss amount was $8.4 million. (ER 25; 10/30/2017 RT 17.) The district court dismissed the expert report, finding that it

"ignore[d] the evidence that was adduced at trial . . . argue[d] defenses that were

ultimately rejected by the jury and is inconsistent with the defense at trial, [and]

fail[ed] to address the defendant's intent."  (ER 25; 10/30/2017 RT 17.)  The

district court noted that Mr. Mirando had not filed a declaration regarding

anticipated reimbursement in light of industry practice, but that "any such

declaration, at least in my view, at this point in the case, hardly seems to be

credible."  (ER 26; 10/30/2017 RT 18.)

Mr. Mirando then clearly and unambiguously expressed his understanding

regarding insurance industry payment practices: "I was well aware the insurance

companies would never pay the actual amount they're based off a percentage,

whether it's—if at all, 25, 30 percent and that's if they pay at all."  (ER 29;

10/30/2017 RT 21.)  He continued: "So you have to bill a certain way in order to

get reimbursed, and that's what I was taught.  I always knew that they only pay 25

to 30 percent."  (ER 29; 10/30/2017 RT 21.)  After being placed under oath, Mr.

Mirando testified regarding insurance industry billing practices: "I knew full well

that the amount that's billed was not the amount to get paid.  It's what I was taught

and that's just par for the course in the medical industry."  (ER 31; 10/30/2017 RT

23.)  He continued: "[Insurance companies] only pay 25 to 30 percent of the billed

amount."  (ER 32; 10/30/2017 RT 24.)  Mr. Mirando's testimony on the subject of

reimbursement rates was definitive:

13

> What I billed I didn't intend to receive a hundred percent, about 25 to 30 percent, which is the industry standard. Most people, to make up the variance, you know, 70, 75 percent is they bill the patients. We never billed the patients and that's – whatever we got from the insurance company was payment in full.

(ER 33; 10/30/2017 RT 25.) The government did not seek to question Mr. Mirando. (ER 34; 10/30/2017 RT 26.) Unsurprisingly, given the district court's repeated assertion that it would not credit Mr. Mirando's testimony, the district court found that the evidence presented was "not sufficient to support his assertion that the total amount billed in this case overestimated his intent." (ER 35; 10/30/2017 RT 27.) The district court overruled counsel's objection and found the intended loss to be $8.4 million. (ER 36; 10/30/2017 RT 28.)

### 3. Mr. Mirando Had No Intent to Cause the Intended Loss Found by the District Court

The law is clear: In health care fraud cases, the intended loss is not the billed amount when there is evidence that the defendant was aware that the insurer would not pay the billed amount, but would only reimburse a certain percentage of each claim. United States v. Popov, 742 F.3d 911, 916 (9th Cir. 2014) ("the amount billed to an insurer shall constitute prima facie evidence of intended loss for sentencing purposes" but "the parties may introduce additional evidence to support arguments that the amount billed overestimates or understates the defendant's intent"); see also United States v. Isiwele, 635 F.3d 196, 203 (5th Cir. 2011) ("the amount fraudulently billed to Medicare is 'prima facie evidence of the

14

amount of loss [the defendant] intended to cause,' but 'the amount billed does not constitute conclusive evidence of intended loss; the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent.'" (quoting United States v. Miller, 316 F.3d 495, 504 (4th Cir. 2003)); United States v. Singh, 390 F.3d 168, 193-94 (2d Cir. 2004) (remanding to allow defendant an opportunity to show "that the total amount he expected to receive from [Medicare] insurers was indeed less than the amounts he actually billed"); United States v. Nachamie, 121 F. Supp. 2d 285, 293 (S.D.N.Y. 2000), aff'd, 28 F. App'x. 13 (2d Cir. 2001) (calculating loss based on actual loss sustained by Medicare based on evidence the government presented at trial); United States v. Fallah, No. H-07-55, 2008 WL 5102281, at *1 (S.D. Tex. Dec. 1, 2008) ("As other courts to consider the question of how to measure the intended loss in a Medicare fraud case have recognized, the intended loss is not the billed amount because all parties knew that Medicare would not pay the billed amount but would only reimburse a capped portion of that amount."). This approach is required because an intended loss "means a loss that the defendant purposely intended to inflict." Manatau, 647 F.3d 1048 at 1050. A defendant cannot purposely intend a loss that he knows cannot result.

Popov is controlling. In Popov, the Court remanded the case to the district court for reconsideration of the loss amount in light of expectation of payment, as

it is "well known that [the insurer] pays much less than the billed amount." Popov, 742 F.3d at 916; see also Nachamie, 121 F. Supp. 2d at 293 n.6 ("It is common knowledge that Medicare and private insurers pay fixed rates for medical procedures.").

At sentencing, Mr. Mirando clearly and unambiguously testified that Holter Labs expected to receive (and actually received) a fraction of the amount billed, and the unrebutted testimony regarding anticipated payment is entirely consistent with the evidence offered by the government regarding actual reimbursement ($2.3 or $3 million) versus billed amounts ($8.4 million). Mr. Mirando's testimony is also consistent with the unrebutted expert report offered by the defense, which noted a national average reimbursement rate of 27 percent. (ER 206; CR 93-1 at 10.) And the testimony is also entirely consistent with the findings of this Court and other courts regarding relatively low rates of reimbursement. Popov, 742 F.3d at 916; Nachamie, 121 F. Supp. 2d at 293 n.6.

Prior to even hearing Mr. Mirando's sworn testimony, however, the district court made clear that it would not credit it. The district court's position ultimately turned a rebuttable presumption into a wholly irrebuttable one. Neither the district court nor the government disputed Mr. Mirando's testimony regarding insurance reimbursement—testimony that was consistent with the government's proffer regarding actual loss. Rather, the district court made a preordained credibility

determination that, considering the district court's prior statements, reflected the foregone conclusion that Mr. Mirando intended to receive the total billed amount. This prejudiced Mr. Mirando because it increased his sentencing offense level by eighteen levels. Because district court failed to correctly calculate the applicable Guidelines range with respect to amount of loss, the district court committed reversible error.

### C. The District Court Erred in Applying the Wrong Standard of Proof

In adopting the findings of the probation officer, the district court found that Mr. Mirando's total offense level was level thirty. (ER 47; 10/30/2017 RT 39.) The probation officer came to this conclusion by adding a number of enhancements to the base offense level of six. Specifically, the probation officer applied an eighteen-level enhancement for intended loss (PSR 1570; CR 91 at 9), a two-level enhancement on account of the number of victims (PSR 1570; CR 91 at 9), a two-level enhancement for sophisticated means (PSR 1570; CR 91 at 10), and a two-level enhancement for obstruction. (PSR 1570; CR 91 at 10.) These enhancements increased Mr. Mirando's Guidelines offense level by a factor of five (from six to thirty), with a corresponding increase in the sentencing range from 0-6 months (at offense level six) to 97-121 months (at offense level thirty).

In the proceedings below, defense counsel argued that, given the disproportionate effect these enhancements would have on the final sentence, the

government had to prove the enhancements by clear-and-convincing evidence, rather than by a preponderance. (ER 187-188; CR 93 at 11-12; ER 80-81; CR 98 at 9-10; ER 20-21; 10/30/2017 RT 12-13.) The probation officer did not even address this argument. The district court found that the enhancements need only be proven by a preponderance of the evidence, and in so ruling, stated: "The law in this circuit is clear that a preponderance standard applies to losses from convictions in health care fraud and cases like this." (ER35; 10/30/2017 RT 27.) As to the loss enhancement, the district court indicated that loss had been proven by clear-and-convincing evidence (ER 36; 10/30/2017 RT 28), but the district court failed to articulate the difference between this standard and the one previously found to be applicable. At no time did the district court address the disproportionate effect of all of the enhancements on Mr. Mirando's sentence.

This Court has consistently held that, where a sentencing factor has a disproportionate effect on a sentence, due process requires the government to prove such a factor by clear-and-convincing evidence. See, e.g., United States v. Hymas, 780 F.3d 1285, 1289-90 (9th Cir. 2015); United States v. Fitch, 659 F.3d 788, 797 (9th Cir. 2011); United States v. Treadwell, 593 F.3d 990, 1000 (9th Cir. 2010); United States v. Staten, 466 F.3d 708, 717-20 (9th Cir. 2006); United States v. Jordan, 256 F.3d 922, 929 (9th Cir. 2001); United States v. Mezas de Jesus, 217 F.3d 638, 642-43 (9th Cir. 2000). This applies whether the disputed finding

18

triggers a mandatory increase or a discretionary increase in the sentence, so long as it triggers an actual increase. Staten, 466 F.3d at 719-20; Fitch, 659 F.3d at 797.

In determining whether a disputed finding requires clear-and-convincing evidence, this Court has adopted a six-factor totality of the circumstances test:

> (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether an increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

Hymas, 780 F.3d at 1290 (quoting Treadwell, 593 F.3d at 1000).

Applying this test to the district court's factual determinations, a heightened evidentiary standard, rather than lip service, was required. Although it is not apparent that the first two factors would ever apply,[4] the remaining factors clearly required the government to meet the higher standard of proof. The district court's determination that Mr. Mirando committed many acts of fraud created new

---

[4] Because the Guidelines do not permit the imposition of a sentence outside the statutory maximum, and no defendant would ever reach sentencing without the presumption of innocence on the charged offense having been overcome either by plea or at trial, it is not clear how the first two factors could ever be triggered.

19

offenses that were not charged as separate crimes. The increase was not based on the extent of a conspiracy. The twenty-four-level increase (from offense level six to offense level thirty) was twenty levels greater than the four-level increase necessary to trigger the heightened evidentiary standard. And the enhanced 97-month sentence increased the length of the sentence *by a factor of fifteen*.

Although the district court referenced a higher evidentiary standard (solely in reference to the loss calculation), it appears that the district court did so for the sole purpose of insulating its decision from appellate review because it cited the standard without analysis, and did so only after misstating the law of this Court regarding evidentiary burdens in cases where enhancements have a disproportionate impact at sentencing: "The law in this circuit is clear that a preponderance standard applies to losses from convictions in health care fraud and cases like this." (ER 35; 10/30/2017 RT 27.) The application of the improper standard of review violated Mr. Mirando's right to due process and constituted reversible error.

### D. The Court's Determination of Loss, the Number of Victims, and Amount of Restitution Was Not Supported by Reliable Evidence

The district court erred in imposing loss and victim enhancements, and restitution, as these findings were not supported by reliable evidence. The facts underlying these enhancements and restitution were not found by Mr. Mirando's jury, and they were inconsistent with the unrebutted expert report submitted by Mr.

Mirando at sentencing. The district court's conclusions, which incorporated the government's unreliable assertions regarding loss, the number of victims, and restitution, lack the necessary indicia of reliability and require reversal.

The government charged Mr. Mirando with fifteen counts of health care fraud. (ER 1548-1549; CR 1 at 7-8.) The charged counts involved four patients and three insurers. (ER 1548-1549; CR 1 at 7-8.) The total loss amount from the charged counts was $10,245. (ER 1548-1549; CR 1 at 7-8.) [5] At trial, the government presented evidence regarding loss on uncharged counts through Agent Kennedy, who had little experience investigating health care fraud cases. (ER 725; 4/28/2017 RT 165.) Ms. Kennedy testified that, although Holter Labs provided services to "thousands of patients," she only identified seven or eight in Southern California to be interviewed. (ER 689; 4/28/2017 RT 129.) She interviewed four physicians in the course of her investigation. (ER 731; 4/28/2017 RT 171.) Ms. Kennedy was hardly an expert on healthcare billing codes, and much of her research consisted of Internet searches on Google and reviewing insurance company web sites. (ER 692; 4/28/2017 RT 132.) Regardless, Ms. Kennedy testified that, based on her analysis, Holter Labs unlawfully billed $8.4 million for duplicate dates of service or testing that could not be performed. (ER 715;

---

[5] The loss specified in the Indictment stems from the amount billed to the insurance companies, which, as stated above, is not ever an accurate reflection of intended loss due to well known, lower reimbursement rates.

21

4/28/2017 RT 155.)  She further testified that insurance companies submitted $3.5 million to Holter Labs as payment for fraudulent claims.  (ER 716; 4/28/2017 RT 156.)  Ms. Kennedy offered no testimony regarding the number of victims.

Without conducting any additional analysis, the probation officer adopted the government's loss calculations and recommended an eighteen-level loss enhancement.  (PSR 1570; CR 91 at 9; PSR 1584-1585; CR 95 at 1-2.)[6]  It adopted the government's calculations regarding the number of victims (again, without analysis) and recommended a two-level enhancement for the number of victims.  (PSR 1570; CR 91 at 9; PSR 1585; CR 95 at 2.)  Without any analysis, the probation officer accepted the government's claims and fixed restitution (what it termed "actual loss") at $3,025,329.47.  (PSR 1570, 1579; CR 91 at 9, 18.)  The probation officer offered no rationale for the discrepancy between the amount it found as actual loss ($3 million) and the government's actual loss claim ($3.5 million).  Nor did the probation officer address the fact that the actual loss alleged in the Indictment was $2.3 million, which is less than either of these figures.  (ER 1547; CR 1 at 6.)

Counsel objected and offered the report of Michael F. Arrigo, whose unrebutted analysis illustrated the flaws in the government's methodology.  Mr.

---

[6]  Although the probation officer indicated that it discussed "limiting loss" with the government, it offered no explanation regarding the nature of these discussions. (PSR 1584; CR 95 at 1.)

Arrigo opined that the government's sample size produced a scientifically invalid result. (ER 218-220; CR 93-1 at 21-23.) Mr. Arrigo pointed out that the government made no effort to determine what the physicians actually ordered to see if the orders matched the billings. (ER 212; CR 93-1 at 15.) He further found that most of the duplicate dates of service claimed by the government were not, in fact, duplicate billings. (ER 212-214; CR 93-1 at 15-17.) Mr. Arrigo also found that the government's claimed restitution amount was wildly inflated on account of the government's flawed methodology. (ER 201, 217-218; CR 93-1 at 5, 20-21.) Neither the government nor the probation officer made any effort to challenge Mr. Arrigo's conclusions. Without citation or analysis, the probation officer dismissed the 133-page report as unpersuasive. (PSR 1585; CR 95 at 2.)

At the sentencing hearing, the district court merely stated that Mr. Arrigo's report "ignored the evidence that was adduced at trial," without identifying any evidence adduced at trial that was inconsistent with the report. (ER 25; 10/30/2017 RT 17.) The district court merely concluded that the report argued "defenses that were ultimately rejected by the jury and is inconsistent with the defense at trial" and failed to address Mr. Mirando's intent.[7] (ER 25; 10/30/2017 RT 17.) The district court then adopted the probation officer's factual findings and Guidelines

---

[7] The district court's comments here only served to illustrate that the district court sought to penalize Mr. Mirando for asserting his Sixth Amendment right to hold the government to its burden of proof at trial.

calculations (ER 47; 10/30/2017 RT 39), and it imposed an eighteen-level enhancement for loss and a two-level enhancement for the number of victims. (ER 36; 10/30/2017 RT 28.) The district court then fixed restitution at $3,025,329.47, the amount claimed by the government at sentencing. (ER 52; 10/30/2017 RT 44.)

The district court's reliance on the government's erroneous calculations regarding loss, restitution, and the number of victims requires reversal. As this Court has repeatedly held, "in establishing the facts, including approximations, underlying a sentence, the district court [must] utilize only evidence that possesses 'sufficient indicia of reliability to support its probable accuracy.'" United States v. Garcia-Sanchez, 189 F.3d 1143, 1149 (9th Cir. 1999) (quoting United States v. August, 86 F.3d 151, 154 (9th Cir. 1996)). Trial courts have "an independent obligation to ensure that the sentence was supported by sufficient, reliable evidence." Garcia-Sanchez, 189 F.3d at 1149; see also United States v. Waknine, 643 F.3d 546, 557 (9th Cir. 2008) (reversing fraud conviction where government did not provide "detailed explanations of the losses each victim suffered"). When there is ambiguity, the district court must err on the side of the defense. United States v. Lemus, 847 F.3d 1016, 1023 (9th Cir. 2016).

As in Waknine, the proffer regarding loss, victims, and restitution was "too summary and too conclusory to be sufficiently reliable in the face of [defense] objections." Waknine, 543 F.3d at 546. Mr. Arrigo's lengthy and detailed report

24

thoroughly dismantled the government's conclusory and fundamentally flawed assertions. But instead of countering the defense arguments, the probation officer, the government, and the district court dismissed them with conclusory statements that they were not persuasive (PSR 1585; CR 95 at 2) or "inconsistent with the defense at trial." (ER 25; 10/30/2017 RT 17). The district court's failure to fulfill its obligation to make findings based on reliable evidence constitutes reversible error.

### E. The District Court Erroneously Applied the Sophisticated-Means Enhancement

The district court also clearly failed to correctly calculate the applicable Guidelines range by erroneously applying, over defense objection (ER 37; 10/30/2017 RT 29), a two-level enhancement pursuant U.S.S.G. §2B1.1(b)(10) for the use of sophisticated means. In applying this enhancement, the district court again adopted the findings of the probation officer. (ER 47; 10/30/2017 RT 39.) The district court justified the enhancement by finding that Mr. Mirando formed a company to "provide [a] fictitious entity" for financial transfers related to the scheme. (ER 37; 10/30/2017 RT 29.) The district court's findings mirror those of the probation officer's recommendations, which asserted that the two-level increase was applicable because "there is no information that this company existed other than to provide a fictitious entity for these transfers." (PSR 1571; CR 91 at 10.)

In the proceedings below, the case agent testified that Mr. Mirando registered an entity called Murrieta Medical Supply ("MMS"). (ER 695; 4/28/2017 RT 135.) Mr. Mirando was the sole signatory on MMS's bank account. (ER 696; 4/28/2017 RT 136.) The agent testified that funds were transferred from the Holter Labs account into the MMS account, and that funds were then withdrawn to pay the personal expenses of the company's owners: the funds "were predominantly for personal funds going to either Michael Mirando or Stanton Crowley." (ER 696; 4/28/2017 RT 136.) At no time did the agent testify that MMS or its bank accounts were part of a scheme to conceal the fraud or otherwise launder funds. There is simply no evidence that MMS played any role in any fraud. Similarly, there is no evidence that Mr. Mirando created MMS to dupe Mr. Crowley regarding any fraud. To the contrary, the undisputed evidence shows that Mr. Crowley knew of, and benefitted from, MMS and its account.

The Guidelines allow for a two-level increase for an individual who employs sophisticated means to perpetrate a fraud. U.S.S.G. §2B.1(b)(10). The commentary to the Guideline indicates that "hiding assets . . . through the use of fictitious entities . . . ordinarily indicates sophisticated means." U.S.S.G. §2B1.1(b)(10), comment. (n.9(B)).

As an initial matter, the sophisticated-means enhancement can only be applied where a fraud is "'especially complex or especially intricate' compared to

the usual fraud offense." United States v. Horob, 735 F.3d 866, 872 (9th Cir.

2013) (quoting U.S.S.G. §2B1.1 comment. (n.8(B)).  "Whether a scheme is

sophisticated must be viewed in light of the fraudulent conduct and differentiated,

by assessing the intricacy or planning of the conduct, from similar offenses

conducted by different defendants." United States v. Hance, 501 F.3d 900, 909

(8th Cir. 2007) (reversing mail-fraud conviction).  The applicability of this

enhancement is extremely limited: "sophistication requires more than the

concealment or complexities inherent in fraud.  Thus, fraud per se is inadequate for

demonstrating the complexity required for enhancement under U.S.S.G.

§2B1.1(b)(10)(C)." United States v. Adepoju, 756 F.3d 250, 258 (4th Cir. 2014)

(reversing bank-fraud and aggravated-identity-theft convictions).  It does not

encompass "any and all offense conduct that conceals an offense." United States

v. Hart, 324 F.3d 575, 579 (8th Cir. 2003).

Even assuming the truth of the entirety of the government's allegations,

there is nothing sophisticated about the Holter Labs business because the

government merely alleged that the corporation billed insurance companies for

services not rendered.  The business did not involve the use of aliases, shell

companies, tax dodges, or offshore havens.  As the government itself

acknowledged: "So the scheme was very simple. There was one legitimate charge

and then there were multiple fraudulent charges that were added onto that."  (ER

1111; 4/26/2017 RT 123.)  Even the probation officer recognized the simplicity of

the operation as a "fairly straightforward fraudulent billing case."  (PSR 1585; CR

95 at 2.)  The case is a simple one and is well within the heartland of fraud cases

seen by this Court.  It is "neither unusual nor particularly sophisticated."  United

States v. Montano, 250 F.3d 709, 715 (9th Cir. 2001) (finding inapplicability of

enhancement in garden-variety smuggling case).  Mr. Mirando's case is very

different from the complex frauds where the Court has upheld the application of

the enhancement.  See United States v. Thomsen, 830 F.3d 1049, 1073 (9th Cir.

2016) (defendant falsified tax returns, checks, and other documents, used deception

to conceal income, and "left a 'complicated and fabricated' paper trail to hide his

fraud") (citation omitted); Horob, 735 F.3d at 872 ("Horob's scheme was complex.

Horob did more than lie to obtain a loan.  He manipulated several people to lie for

him, used several different bank accounts (including accounts of other people) to

move funds around, and fabricated numerous documents.  Moreover, the

complicated and fabricated paper trail made discovery of his fraud difficult.").

Misapplication of the sophisticated-means enhancement requires reversal.

Moreover, there is no evidence that the MMS had any nexus to any fraud,

and MMS was not used to conceal any fraud.  The government acknowledges that

Mr. Mirando registered MMS using his own true name.  (ER 695; 4/28/2017 RT

135.)  Mr. Mirando himself was the signatory on the MMS bank account.  (ER

28

695-696; 4/28/2017 RT 135-136.)  MMS was not involved in any billing to insurance companies.  Any and all funds in the MMS account could be easily traced back to Mr. Mirando and Holter Labs.  Because neither MMS nor its bank account had any nexus to any fraud, the enhancement is inapplicable.  United States v. Tit Yat Chin, 372 F.3d 31, 41-42 (2d Cir. 2004) (although defendant used fictitious entities, enhancement inapplicable where no "intricate or complex steps" made to commit crime; conviction reversed); Hart, 324 F.3d at 579 (no sophisticated-means enhancement where the government "could trace all of the income" back to a defendant; conviction reversed).

Because the scheme did not involve any intricacy or complexity that was significantly greater than that found in the average fraud scheme, it was unreasonable and therefore reversible error for the district court to impose a two-level upward adjustment in its Guidelines calculations for the use of sophisticated means.

**F.    The District Court Improperly Penalized Mr. Mirando For Exercising His Right to Trial by Jury**

In dismissing Mr. Mirando's sentencing arguments and testimony as being inconsistent with his trial defense, the district court penalized Mr. Mirando for exercising his Sixth Amendment right to a trial by jury.  At the very least, the district court's comments created an unacceptable risk that Mr. Mirando's sentence

was enhanced on account of his decision to proceed to trial. The district court's inappropriate comments require reversal.

As was his right, Mr. Mirando chose to go to trial and to put the government to its burden of proof. Defense counsel did not present an affirmative case to the jury. Counsel did not call any witnesses. Mr. Mirando did not testify. Mr. Mirando's testimony at sentencing was his first statement to the district court.

At sentencing, the district court began the hearing by scoffing at counsel's argument that Mr. Mirando had no expectation of receiving full payment from insurance companies: "That's his claim now? Because I thought his entire defense was hey, I didn't know anything about this business from day one. There were these other fraudsters who really were the guys who taught me how to do this. Now he's claiming that he was an expert in the insurance industry?" (ER 14-15; 10/30/2017 RT 6-7.) The government then argued that counsel's arguments were inappropriate: "As the Court has noted, many of the arguments that are being raised now are inconsistent with arguments that were raised at trial." (ER 23; 10/30/2017 RT 15.) The district court continued, making clear that it would reject any testimony by Mr. Mirando—*and did so even before hearing testimony from Mr. Mirando*. (ER 26; 10/30/2017 RT 18.) ("[T]he parties could have introduced additional evidence to support arguments that the amount billed overstates or understates the defendant's intent. There was no declaration submitted by the

30

defendant stating that he never intended to receive fraudulent claims, and any such declaration, at least in my view, at this point in this case, hardly seems to be credible.")

Speaking to the district court, Mr. Mirando expressed contrition for his actions: "I take full responsibility for submitting the claims." (ER 32; 10/30/2017 RT 24.) See also ER 44; 10/30/2017 RT 36 ("I want to say I take full responsibility as the co-owner that I should have been more diligent on the billing practices."); ER 45-46; 10/30/2017 RT 37-38 ("I take responsibility, like I said best as I could, I voluntarily shut down my company, nobody told me to do that. I no longer want to work in the medical industry, you know, I have lots of friends and family here that I let down.").

Not surprisingly, the district court dismissed Mr. Mirando's testimony at sentencing. As noted above, it rejected Mr. Mirando's unrebutted testimony regarding intended loss, stating that his testimony lacked credibility. (ER 35; 10/30/2017 RT 27.) It repeatedly referred to the jury verdict, which had little to do with the sentencing rulings, stating that the jury rejected Mr. Mirando's arguments: "He argues defenses that were ultimately rejected by the jury and is inconsistent with the defense at trial and fails to address the defendant's intent." (ER 25; 10/30/2017 RT 17.) See also ER 48-49; 10/30/2017 RT 40-41 ("During the trial the jury found that the defendant filed false claims and rejected his attempts to shift

31

the blame to others.").  Although the district court claimed to respect Mr.

Mirando's right to put the government to its burden of proof, it followed that

statement by criticizing Mr. Mirando for his "refusal to accept responsibility and

accountability."  (ER 50; 10/30/2017 RT 42.)  Counsel objected, and noted that

Mr. Mirando indeed accepted responsibility for his actions: "This is the first time

he's addressed [the district court] and he did accept responsibility."  (ER 55;

10/30/2017 RT 47.)  The district court responded by stating that counsel could take

his complaint to this Court.  (ER 55; 10/30/2017 RT 47.)  Counsel again objected,

stating that the district court's comments had the effect of penalizing Mr. Mirando

for exercising his constitutional right to trial by jury.  (ER 55; 10/30/2017 RT 47.)

The district court's comments were improper and require reversal.  As this

Court has repeatedly held: "It is well settled that an accused may not be subjected

to more severe punishment simply because he exercised his right to stand trial."

United States v. Kleinman, 880 F.3d 1020, 1040 (9th Cir. 2018) (quoting United

States v. Medina-Cervantes, 690 F.2d 715, 716 (9th Cir. 1982); see also United

States v. Harris,  635 F.2d 526, 529 (6th Cir. 1980) ("The trial court must not

penalize the defendant for exercising his constitutional right to plead not guilty and

go to trial; whether or not the defendant exercises his right to trial must have no

bearing on the sentence he receives."); Bordenkircher v. Hayes, 434 U.S. 357, 363

(1978) ( "To punish a person because he has done what the law plainly allows him

32

to do is a due process violation of the most basic sort. . .").  Even the *risk* of a trial

penalty mandates reversal.  United States v. Cruz, 977 F.2d 732, 734 (2d Cir.

1992) (the district court's remarks "created an unacceptable risk that the sentence

was impermissibly enhanced above an otherwise appropriate sentencing norm to

penalize the defendant for exercising his constitutional right to stand trial");

Medina-Cervantes, 690 F.2d at 716 (statements which "give rise to the inference"

of a trial penalty constitute reversible error).

Medina-Cervantes has special relevance here.  In Medina-Cervantes, the

district court commented that a defendant's exercise of his right to trial "thumb[ed]

his nose" at the judicial system."  Id. at 716.  Although the district court sentenced

Medina-Cervantes within the statutory maximum penalty, this Court nevertheless

reversed, citing the "'chilling effect' upon the exercise of the right to trial

presented by even the appearance of such a practice."  Id. at 717.

The "chilling effect" present in Medina-Cervantes is no less pronounced

here.  The district court's comments make clear that, given the defense at trial, it

would refuse to give weight to any arguments it perceived to be inconsistent with

that defense.  The district court effectively foreclosed any sentencing arguments or

statements of contrition that Mr. Mirando could offer—and did offer—at

sentencing.  Despite making passing reference to not penalizing Mr. Mirando for

asserting his right to put the government to its burden of proof, the district court's

33

statements in dismissing Mr. Mirando's substantive legal arguments and apologies for his actions made clear the district court's true intention. This case presents an "unacceptable risk" Mr. Mirando's sentence was enhanced merely because Mr. Mirando exercised his right to proceed to trial.

## II.    Trial Errors

### A.    The District Court Improperly Limited Cross-Examination of Chief Prosecution Witness Stanton Crowley

#### 1.    Standard of Review

A district court's exclusion of an area of inquiry is subject to de novo review, while a ruling limiting the scope of cross-examination is reviewed for abuse of discretion. United States v. Larson, 495 F.3d 1094, 1101 (9th Cir. 2007) (en banc). The claim is subject to harmless-error analysis. Id. at 1107. In determining whether the error requires reversal, the Court should consider "[t]he importance of the testimony to the case, presence or absence of other evidence corroborating or contradicting the witness, extent of permitted cross-examination, and overall strength of the prosecution's case." United States v. Schoneberg, 396 F.3d 1036, 1044 (9th Cir. 2005).

#### 2.    The District Court's Rulings Significantly Hampered Mr. Mirando's Defense

The government's chief witness against Mr. Mirando was Stanton Crowley, the co-founder and co-owner of Holter Labs. Mr. Crowley was the sole witness

who provided insider testimony regarding the company's operations. Indeed, it was Mr. Crowley who referred the case to law enforcement authorities. Despite the significance of Mr. Crowley's role in the government's case, the district court prevented Mr. Mirando's counsel from pursuing lines of cross-examination which would have shed light on Mr. Crowley's crimes, prior bad acts, and motivation to testify. The district court's limitations effectively denied Mr. Mirando his right to defend himself.

Mr. Crowley formed Holter Labs with Mr. Mirando in 2005. (ER 967; 4/27/2017 RT 214.) Prior to forming the company, Mr. Crowley had experience working at multiple companies dealing in Holter monitors, dating back to 1998. (ER 616-617; 4/28/2017 RT 56-57.) He had previously been accused of stealing trade secrets and client lists from one of his prior employers. (ER 617-618; 4/28/2017 RT 57-58.) Mr. Mirando, who had no experience with Holter monitors, had no experience with billing, either. (ER 636; 4/28/2017 RT 76.) James Cast, a third partner in the business (who had previously worked with Mr. Crowley), taught medical billing to Mr. Mirando. (ER 636, 638; 4/28/2017 RT 76, 78.) Mr. Crowley testified that, although he saw the billing "from a distance," he "didn't pay attention." (ER 649; 4/28/2017 RT 89.)

Mr. Crowley made upwards of $200,000 per year as an owner of Holter Labs. (ER 643; 4/28/2017 RT 83.) Despite making a significant salary, Mr.

Crowley refused to pay taxes from 2005 through 2011. (ER 675; 4/28/2017 RT 115.) Mr. Mirando's counsel repeatedly sought to question him about his failure to file tax returns, which constitutes a criminal act, and about what assurances he had received from the government regarding his exposure to criminal liability, but the district court repeatedly shut down such questioning. Specifically, the district court prohibited questioning regarding Mr. Crowley's failure to file tax returns (ER 675-676; 4/28/2017 RT 115-116); his earnings at other corporations (ER 679; 4/28/2017 RT 119); and whether the government had ever indicated that his failure to pay his taxes subjected him to criminal liability. (ER 682-683; 4/28/2017 RT 122-23.)

The district court's failure to allow questioning of the government's most important witness regarding the scope of that witness's own criminal activity denied Mr. Mirando the right to challenge his accuser's credibility. As this Court has held, "[c]entral to the Confrontation Clause is the right of a defendant to examine a witness's credibility." United States v. Adamson, 291 F.3d 606, 612 (9th Cir. 2002) (citing Davis v. Alaska, 415 U.S. 308, 316 (1974)). To be clear, "wide latitude [should] be given to defendants in their cross-examination of key prosecution witnesses." United States v. Uramoto, 638 F.3d 84, 86-87 (9th Cir. 1980) (conviction reversed where excluded cross-examination "could have colored" the jury's assessment of an informant's credibility); Fowler v. Sacramento

36

County Sheriff's Department, 421 F.3d 1027, 1036 (9th Cir. 2005) ("it is sufficient that a jury 'might reasonably' have questioned the witness's reliability or credibility in light of the cross-examination") (quoting Delaware v. Van Arsdall, 475 U.S 673, 679 (1986)). A witness's motivation for testifying, which undoubtedly includes potential exposure to criminal liability for his misdeeds—is "a proper and important function of the constitutionally protected right of cross-examination. United States v. Kohring, 637 F.3d 895, 905 (9th Cir. 2011) (quoting Davis, 415 U.S. at 316-17).

Here, the district court's erroneous rulings precluded a valuable line of cross-examination for the government's chief witness. Stanton Crowley was the government's sole witness to testify regarding the inner workings of Holter Labs, and his testimony put the blame for any overbilling at the feet of Mr. Mirando. Crowley's testimony would have been significantly undercut if the jury had known of his wholesale failure to pay taxes for a period of years. The district court sustained a relevance objection to counsel's question regarding Mr. Crowley's crimes in failing to pay taxes while he worked for Holter Labs: "Now eight years of work basically from 2005 to 2011, we're talking 6 or 7 years, from '07, '08, '09, and, '10, did you file tax returns in the same year they were due?" (ER 675-676; 4/28/2017 RT 115-16.) This error, which alone would require reversal, was compounded by the district court's refusal to allow testimony regarding the

assurances that Mr. Crowley received from law-enforcement officials regarding

any potential criminal liability for his failure to pay taxes. (ER 682-683; 4/28/2017

RT 122-23.) This line of questioning would have provided the jury with ample

evidence with which to question this critical witness's credibility. As a result, the

district court's rulings prohibiting the questioning warrant reversal.

### B. The District Court Improperly Instructed the Jury Regarding Intent

#### 1. Standard of Review

A district court's misstatement of the elements of an offense is subject to de

novo review. United States v. Rodriguez, 880 F.3d 1151, 1159 (9th Cir. 2018) ("A

district court's formulation of jury instructions must adequately cover the

applicable law and must not be misleading. We review the instructions as a whole

when determining if there was instructional error.") (quotations and citation

omitted); United States v. Romo-Romo, 246 F.3d 1272, 1274 (9th Cir. 2001)

("Whether a jury instruction misstates elements of a statutory crime is a question of

law reviewed de novo."). This is the case even though trial counsel lodged no

objection to the instruction: the issue is a legal one, and the government will not

suffer prejudice. See, e.g., United States v. Joseph, 716 F.3d 1273, 1276 n.4 (9th

Cir. 2013) ("we 'are not limited to a plain error standard of review where the

appeal presents a pure question of law and there is no prejudice to the opposing

party' that resulted from a defendant's failure to object") (quoting United States v.

38

Gonzalez-Aparicio, 663 F.3d 419, 426 (9th Cir. 2011)).  The Court seeks to

determine "whether the instructions as a whole are misleading or inadequate to

guide the jury's deliberation."  United States v. Cherer, 513 F.3d 1150, 1155 (9th

Cir. 2008).

### 2. The District Court's Instructions Regarding Intent Were Flawed and Misleading

The district court instructed the jury according to Ninth Circuit Model Jury

Instruction 8.121, which defines "intent to defraud" as "the intent to deceive or

cheat."  (ER510; 5/2/2017 RT 46; see also CR 34 at 33-34.)[8]  This instruction

failed to require a finding that that any intent to deceive be for the purposes of

causing some financial loss to another and is, therefore, an incorrect statement of

the law.  The district court compounded the error when it additionally instructed

the jury that neither loss, nor an intent to cause loss, is an element of health care

fraud.  (ER510; 5/2/2017 RT 46.)

At the outset, Mr. Mirando acknowledges that the Court has previously

upheld the language in model instruction 8.121.  United States v. Livingston, 725

F.3d 1141, 1148 (9th Cir. 2013) (upholding the use of "intent to deceive or cheat"

---

[8]  The district court used similar language in its preliminary instructions to the jury, where it defined the intent to defraud as "the intent to deceive or cheat."  (ER 1101; 4/26/2017 RT 113.)

language).  Mr. Mirando respectfully submits, however, that <u>Livingston</u> is not consistent with the plain language of the statute and requires reconsideration.[9]

The mail, wire, and bank fraud statutes (18 U.S.C. §§1341, 1343, and 1344), all proscribe a "scheme or artifice," first, "to defraud," and/or, second, "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  At first, these statutes seem to prohibit two types of conduct: scheme to cheat someone, and a scheme to deceive someone, but the Supreme Court rejected this view.  In <u>McNally v. United States</u>, 483 U.S. 350, 358-59 (1987), the Supreme Court stated that Congress added the second phrase simply to modify the first phrase in order to emphasize that the statute reached false promises and misrepresentations about the future.  The <u>McNally</u> opinion was superseded by statute, however, so the Supreme Court revisited the issue again in <u>Cleveland v. United States</u>, 531 U.S. 12 (2000).  In that mail-fraud case, the Supreme Court made it clear that an intent to defraud is an element of both prongs:

---

[9]  The fact that the district court used the pattern instruction does not insulate the instruction from the Court's review.  The Court has previously invalidated numerous model instructions.  <u>See</u> <u>United States v. Smith</u>, 561 F.3d 934, 937-38 (9th Cir. 2009) (holding model Ninth Circuit assault with a dangerous weapon instruction partially invalid); <u>United States v. Paul</u>, 37 F.3d 496, 500 (9th Cir. 1994) (holding model manslaughter instruction invalid); <u>United States v. Lessard</u>, 17 F.3d 303, 305-06 (9th Cir. 1994) (holding model entrapment instruction invalid); <u>United States v. Mendoza</u>, 11 F.3d 126, 128-29 n.2 (9th Cir. 1993) (holding model 18 U.S.C. §924(c) elements instruction invalid); and <u>United States v. Terry</u>, 911 F.2d 272, 280 (9th Cir. 1990) (holding model constructive possession instruction invalid).

> '[T]he mail fraud statute . . . had its origin in the desire to protect
> individual property rights, and any benefit which the Government
> derives from the statute must be limited to the Government's interests
> as property holder.' We reaffirm our reading of §1341 in <u>McNally</u>.
> Were the Government correct that the second phrase of §1341 defines
> a separate offense, the statute would appear to arm federal prosecutors
> with power to police false statements in an enormous range of
> submissions to state and local authorities. For reasons already stated,
> we decline to attribute to §1341 a purpose so encompassing where
> Congress has not made such a design clear.

<u>Cleveland</u>, 531 U.S. at 26 (citations omitted).

An intent to defraud necessarily means that the defendant contemplated and intended some actual harm or injury to his alleged victims. <u>See</u>, <u>e.g.</u>, <u>United States v. Starr</u>, 816 F.2d 94, 98 (2d Cir. 1987) (only a showing of intended harm will satisfy the element of fraudulent intent); <u>United States v. Jain</u>, 93 F.3d 436, 442 (8th Cir. 1996) (the essence of a scheme to defraud is an intent to harm the victim); <u>United States v. Cochran</u>, 109 F.3d 660, 667-69 (10th Cir. 1997).

The Ninth Circuit's pattern jury instruction on intent to defraud, which was given by the district court below, is an incorrect statement of the law because it is written in the disjunctive, not the conjunctive. Model Instruction 8.121 defines "intent to defraud" as "the intent to steal or cheat." This instruction eliminates the need to prove an intent to cheat, which is required by statute: "the statute does require evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful."

41

The district court's erroneous instruction was compounded by the insertion of an additional requirement relieving the government from its burden to prove an intent to cause loss. This language, which was not part of the misleading model instruction, only served to reaffirm that flawed instruction. The district court's misstatements regarding Mr. Mirando's intent require reversal.

## CONCLUSION

For the foregoing reasons, Mr. Mirando respectfully requests that the Court order a new trial on all counts of conviction. At a minimum, Mr. Mirando respectfully requests that the Court remand this case for resentencing.

DATED: April 4, 2018        Respectfully submitted,

SPERTUS, LANDES & UMHOFER, LLP

s/ James W. Spertus
James W. Spertus
John Hanusz

Attorneys for Defendant-Appellant

## CERTIFICATE OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, undersigned counsel hereby states that it is unaware of any related cases pending in this Court.

DATED: April 4, 2018                    Respectfully submitted,

SPERTUS, LANDES & UMHOFER, LLP

s/ James W. Spertus
James W. Spertus
John Hanusz

Attorneys for Defendant-Appellant

**Form 8.**  **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f),
29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 17-50386

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is 9876 words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated _____
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | s/ James W. Spertus    Date Apr 4, 2018

("s/" plus typed name is acceptable for electronically-filed documents)

9th Circuit Case Number(s) | 17-50386

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Apr 4, 2018 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ James W. Spertus

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)